CLERKS OFFICE US DISTRICT COURT
AT ABINGDON, VA
FILED

July 10, 2024
LAURA A. AUSTIN, CLERK
BY: /s/ Robin Bordwine
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **MICHAEL R. KETRON,** | ) | |
| Plaintiff | ) | Civil Action No. 2:23cv00011 |
| | ) | |
| v. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **MARTIN J. O'MALLEY,**[1] | ) | |
| **Commissioner of Social Security,** | ) | By:  PAMELA MEADE SARGENT |
| Defendant. | ) | United States Magistrate Judge |
| | ) | |

## *I. Background and Standard of Review*

Plaintiff, Michael R. Ketron, ("Ketron"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claim for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. §§ 423 and 1381 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). Neither party has requested oral argument; therefore, this case is ripe for decision.  As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached

---

[1] Martin J. O'Malley, ("O'Malley"), became the Commissioner of Social Security on December 20, 2023. Pursuant to Federal Rules of Civil Procedure Rule 25(d), O'Malley should, therefore, be substituted for Kilolo Kijakazi as the defendant in this case. Pursuant to the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), no further action is required to continue this suit.

through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4ᵗʰ Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4ᵗʰ Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4ᵗʰ Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows Ketron protectively filed applications for DIB and SSI[2] on May 12, 2020, alleging disability as of May 30, 2019, due to diabetes, glaucoma,

---

[2] Ketron previously filed an application for DIB on August 4, 2017, alleging disability beginning December 1, 2015. (R. at 89.) By decision dated May 29, 2019, an ALJ denied his claim. (R. at 89-99.)

Pursuant to the Fourth Circuit's opinion in *Albright v. Comm'r of Soc. Sec. Admin.,* 174 F.3d 473 (4ᵗʰ Cir. 1999), and in accordance with Social Security Acquiescence Ruling, ("A.R.") 00-1(4), "[w]hen adjudicating a subsequent disability claim arising under the same … title of the Act as the prior claim, an adjudicator determining whether a claimant is disabled during a previously unadjudicated period must consider such a prior finding as evidence" and consider its persuasiveness in light of all relevant facts and circumstances. A.R. 00-1(4), 65 Fed. Reg. 1936-01, at *1938, 2000 WL 17162 (Jan. 12, 2000). Pursuant to A.R. 00-1(4), the ALJ must consider prior ALJ findings using factors articulated in *Albright* such as (1) whether the fact on which the prior finding was based is subject to change with the passage of time, such as a fact relating to the severity of a claimant's medical condition; (2) the likelihood of such a change, considering the length of time that has elapsed between the period previously adjudicated and the period under consideration in the subsequent claim; and (3) the extent that evidence not considered in the final decision on the prior claim provides a basis for making a different finding with respect to the period being adjudicated in the subsequent claim. *See* A.R. 00-1(4), 65 Fed. Reg. 1936-01, at *1938, 2000 WL 17162.

The ALJ in this case correctly articulated the *Albright* standard when analyzing the prior ALJ decision. As to the May 29, 2019, decision, the ALJ stated that she found the decision persuasive because it was supported by the current medical record and was consistent with Ketron's complaints. (R. at 60.) Specifically, the ALJ found Ketron's testimony that he could walk up to two hundred feet before feeling shortness of breath, as well as his allegations of intermittent pain and neuropathy, were consistent with the prior ALJ's residual functional capacity determination. (R. at 60.)

diabetic neuropathy, gout, high blood pressure, high cholesterol, previous heart attack, fasciitis, kidney problems, back and knee problems and sleep apnea. (Record, ("R."), at 308-20, 353.) The claims were denied initially and on reconsideration. (R. at 197-210, 285-87.) Ketron requested a hearing before an administrative law judge, ("ALJ"). (R. at 211-12.) A hearing was held on November 12, 2021, at which Ketron was represented by counsel. (R. at 70-85.)

By decision dated December 10, 2021, the ALJ denied Ketron's claims. (R. at 51-63.) The ALJ found Ketron met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2020. (R. at 54.) The ALJ found Ketron had not engaged in substantial gainful activity since May 30, 2019, the alleged onset date.[3] (R. at 54.) The ALJ determined Ketron had severe impairments, namely, degenerative joint disease of left knee, obesity, diabetes mellitus, neuropathy and obstructive sleep apnea, but she found Ketron did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 54-57.)

The ALJ found Ketron had the residual functional capacity to perform light[4] work, except he could never climb ladders, ropes and scaffolds; never perform fine balancing; occasionally perform other postural movements; occasionally use foot pedals bilaterally; frequently reach, push and pull with his upper extremities; have occasional exposure to extreme temperatures; and he could not work in industrial

---

[3] Therefore, Ketron must show that he became disabled between May 30, 2019, his alleged disability onset date, and December 30, 2020, to be eligible for DIB benefits.

[4] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2023).

vibration or be exposed to unprotected heights. (R. at 57.) The ALJ found Ketron was unable to perform his past relevant work as a heavy equipment mechanic and an electrician. (R. at 61.) However, based on his age, education, work experience and residual functional capacity and the testimony of a vocational expert, the ALJ found he could perform jobs existing in significant numbers in the national economy, including those of a router, a counter clerk and a marker. (R. at 62.) Thus, the ALJ concluded Ketron was not under a disability as defined by the Act, from May 30, 2019, through the date of the decision, and he was not eligible for DIB and SSI benefits. (R. at 63.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2023).

After the ALJ issued her decision, Ketron pursued his administrative appeals, but the Appeals Council denied his request for review.[5] (R. at 1-6.) Ketron then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2023). This case is before this court on Ketron's motion for summary judgment filed August 7, 2023, and the Commissioner's brief filed November 6, 2023.

## II. Facts

Ketron was born in 1972, (R. at 61, 310), which classifies him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). He has a high school

---

[5] Ketron initially filed a request for administrative review on December 10, 2021. (R. at 1.) On January 27, 2022, Ketron's counsel wrote the Appeals Council indicating that Ketron wished to withdraw his claim for benefits, and on July 20, 2022, the Appeals Council ordered that Ketron's request for review was dismissed. (R. at 10-13, 25.) On July 26, 2022, Ketron's counsel wrote to the Appeals Council indicating that Ketron had never intended on withdrawing his appeal and that his counsel had submitted a request for Appeals Council review on February 4, 2022. (R. at 305-07, 426-27.) On March 14, 2023, the Appeals Council set aside its earlier decision to dismiss the appeal, but after reviewing newly submitted evidence, it denied review. (R. at 1-6.)

education. (R. at 61.) Ketron testified he suffered from uncontrolled Type 2 diabetes and neuropathy. (R. at 75.) He also stated that he suffered from coronary artery disease, depression and severe sleep apnea. (R. at 75.) Ketron testified that he had previously worked as a section mechanic but did not resume working after he was laid off in 2015 due to the development of his allegedly disabling condition. (R. at 76-77.) Ketron testified that he used a cane most of the time and had been since his doctor prescribed it in 2016. (R. at 77.) Ketron testified that due to neuropathy, he did not wear any shoes or socks unless he had to because they increased his pain. (R. at 80.)

Ketron testified he lived with his son and his son's girlfriend, neither of whom he cared for. (R. at 75.) Ketron testified that he had a drivers license and had driven himself to the hearing. (R. at 75-76.) Ketron denied cooking, cleaning, doing laundry or going grocery shopping. (R. at 79.) Ketron further testified that he did not drink alcohol, smoke or use any nonprescribed drugs or medication. (R. at 80.)

In rendering his decision, the ALJ reviewed records from Dr. Gene Godwin, M.D., a state agency physician; Stephen Saxby, Ph.D., a state agency psychologist; Dr. David Bristow, M.D., a state agency physician; Norton Community Hospital; Johnston Memorial Diabetes Care Center; Community Physicians Thomas Renfro Clinic; Ballad Health Medical Associates; Wise County Behavioral Health Services; Wellmont Holston Valley Medical Center; Repko Family Vision; and Mountain Empire Eye Physicians. Ketron's counsel submitted additional medical records from Community Physicians Thomas Renfro Clinic; Ballad Health Medical Associates

Diabetes and Endocrinology; Amalia C. Collins, L.C.S.W./L.P.C.; and Lara C. Reynolds, F.N.P.-C., to the Appeals Council.[6]

On March 15, 2019, Ketron saw Lora Reynolds, F.N.P.-C., a nurse practitioner, at Ballad Health Medical Associates Diabetes and Endocrinology. (R. at 918.) Ketron indicated that his blood sugar was in the 200-300 range all of the time. (R. at 918.) Ketron complained of cough and shortness of breath, lower extremity edema, recent weight gain, sensory abnormalities of the feet, depression and polydipsia but denied all other symptoms. (R. at 920-21.) Physical examination was unremarkable. (R. at 921.) Reynolds noted that Ketron's diabetes had worsened, and she instructed him to comply with a low carbohydrate diet and to return for further management in one month. (R. at 921-22.)

On April 23, 2019, Ketron was admitted to Norton Community Hospital for low blood sugar. (R. at 1025-26.) He was treated for hypoglycemia and discharged several hours later. (R. at 1027.)

On May 7, 2019, Ketron saw Kathi Price, F.N.P.-C., a nurse practitioner and his primary care provider, for a follow up on diabetes and high blood pressure. (R. at 785.) Ketron indicated that he had recently been to the emergency room for a blood sugar of 60 that had dropped to 40 at the hospital. (R. at 785.) Price noted that Ketron was not compliant with his diet, and that he ate high-carbohydrate, low-protein foods such as chips for breakfast, and he would occasionally take insulin in the morning even if he did not eat. (R. at 785.) Ketron endorsed occasionally having

---

[6] Since the Appeals Council considered this evidence in deciding not to grant review, (R. at 1-6), this court also must consider it in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

a dry cough, but denied all other pertinent symptoms. (R. at 785.) Physical examination was normal, and a depression screening was negative for depression. (R. at 785, 787.) Labs taken at this visit showed very elevated triglycerides, and Ketron was instructed on the importance of managing his diabetes and taking medications for his triglyceride levels. (R. at 779.) On July 10, Ketron followed up with Price, who noted that Ketron was still poorly managing his diabetes. (R. at 771.) Ketron was using a cane at the office, and he indicated to Price it was because he occasionally became lightheaded. (R. at 771.) Price noted that a recent echocardiogram showed an elevated heart rate and was consistent with a myocardial infarction of the anterior wall. (R. at 773.) Ketron endorsed arthralgias, foot pain and intermittent episodes of mild dizziness, but denied all other symptoms. (R. at 771.) Physical examination was unremarkable. (R. at 773.) Labs completed on July 15 showed abnormal thyroid function, and Price ordered a repeat test in two weeks. (R. at 767.) Follow up testing was performed on July 25 and did not show clinically significant thyroid impairment. (R. at 617.)

On September 23, 2019, Ketron underwent a transthoracic echocardiogram pursuant to the referral of his primary care provider. (R. at 541-42.) The test yielded no evidence of pulmonary hypertension based on right ventricular systolic pressure, ("RVSP"), and Ketron's left ventricle ejection fraction was normal. (R. at 541-42.)

On September 26, 2019, Ketron saw Price for follow up. (R. at 758.) Ketron reported poor compliance to a diabetic diet, with his sugars frequently in the 250 range. (R. at 758.) Ketron endorsed arthralgias, foot pain and intermittent episodes of mild dizziness, but no other symptoms. (R. at 758.) Physical examination was unremarkable. (R. at 760.) At his next appointment on December 16, Ketron reported that his sugars had been high in the evening, but he had not been watching his diet.

(R. at 748.) Ketron endorsed arthralgias, foot pain and intermittent episodes of mild dizziness, but denied all other symptoms. (R. at 748.) Physical examination was unremarkable. (R. at 750.) Labs taken at this visit showed very elevated triglycerides, and Price instructed Ketron to be compliant with medication and to eat a healthy diet. (R. at 746.)

On October 18, 2019, Ketron saw Reynolds for a routine clinical follow up on diabetes. (R. at 546.) Ketron's A1C was down from 7.9 percent to 7.2 percent at this visit, demonstrating an improvement. (R. at 546.) Ketron complained of recent weight gain, shortness of breath, dizziness and sensory abnormality of the foot but denied all other symptoms. (R. at 549.) Physical examination, including a diabetic foot examination, was unremarkable. (R. at 549-51.) Reynolds stated that Ketron's diabetes had improved, noting that Ketron's A1C goal was to be less than 6.5 percent, and indicated that she would continue to adjust Ketron's insulin by email. (R. at 551.)

On March 16, 2020, Ketron saw Price for high blood pressure, obesity, uncontrolled Type 2 diabetes, mixed hyperlipidemia and diabetic peripheral neuropathy. (R. at 737.) Ketron complained of intermittent episodes of mild dizziness, arthralgias and foot pain. (R. at 740.) Physical examination was unremarkable, showing normal lower extremity peripheral neurological findings and a normal diabetic foot examination. (R. at 742-43.) Price noted that, while Ketron had scheduled a diabetic eye examination, he did not keep his appointment. (R. at 743.) Price advised Ketron to be more compliant with diet and exercise and prescribed gabapentin for neuropathy. (R. at 743.)

On April 17, 2020, Ketron saw Reynolds for a routine clinical follow up on diabetes. (R. at 555.) Ketron's A1C was 7.7 percent, up from 7.1 percent at a visit with his primary care provider in March 2020. (R. at 555.) Ketron endorsed recent weight gain, sensory abnormality of the feet, lower extremity edema and polydipsia, but he denied all other symptoms. (R. at 558.) Physical examination was unremarkable. (R. at 558-59.) Reynolds noted that Ketron's diabetes had improved, and she would continue to adjust his medication through email. (R. at 559.)

On May 4, 2020, Ketron presented to Johnston Memorial Hospital at the referral of his primary care provider for evaluation of snoring and difficulty sleeping. (R. at 567-68.) Ketron complained of weight gain, blurry vision, dyspnea with exertion, waking short of breath, ankle swelling, frequent urination, joint swelling, increased thirst and dry skin. (R. at 567-68.) He denied all other symptoms. (R. at 567-68.) Dr. Emory Robinette, M.D., noted that Ketron had slightly labored breathing, and his muscle strength was 4/5 in the upper extremities and 3/5 in the lower extremities. (R. at 568.) Due to the Covid-19 pandemic, Dr. Robinette performed a home sleep study on Ketron, the results of which indicated that Ketron had severe sleep apnea. (R. at 565-66.) Dr. Robinette recommended clinical correlation of the results due to the severity of Ketron's suspected sleep apnea. (R. at 566.)

On June 16, 2020, Ketron saw Price for a three-month follow up and indicated that he had run out of gabapentin one month prior, but was unable to get a refill. (R. at 902.) Ketron complained of back pain, but denied all other symptoms. (R. at 904.) Physical examination was unremarkable, but it was noted that Ketron was using a cane for balance. (R. at 905.) Ketron's back pain was described as chronic, mild and controlled without medication. (R. at 902.) Ketron denied diabetes-related foot pain,

chest pain and fatigue. (R. at 902.) Price ordered a lipid screen for hyperlipidemia, and she instructed Ketron on management of his diabetes. (R. at 905.)

On August 19, 2020, Ketron was admitted to Norton Community Hospital's emergency department for feelings of light headedness. (R. at 979.) A CT scan of the head showed no acute intracranial process, and vertebrobasilar intracranial atherosclerosis.[7] (R. at 986.) An electrocardiogram, ("EKG"), performed at this time showed a normal sinus rhythm. (R. at 988-91.) Imaging of the chest showed no acute cardiopulmonary disease. (R. at 984.) Labs taken at this time indicated impaired kidney function, likely secondary to dehydration, and Ketron was discharged several hours later. (R. at 978, 980-83, 997-98.)

On August 20, 2020, Ketron saw Price for follow up on his recent emergency room admission. (R. at 892.) Ketron stated that he had been breathing harder lately and that he had an ingrown toenail. (R. at 892.) Physical examination showed a slightly elevated respiration rate of 22 breaths per minute and an ingrown toenail, but was normal otherwise. (R. at 894-95.) Ketron indicated that he had not been taking his diabetes medication as instructed. (R. at 892.) Price ordered lab work, which showed elevated creatinine and blood urea nitrogen, as well as low glomerular filtration rate, indicating impaired kidney function. (R. at 895.) Price instructed Ketron to follow up in six days, and she referred him to obtain an echocardiogram for his shortness of breath. (R. at 895.) At Ketron's follow-up appointment, Price

---

[7] Calcifications of the vertebral basilar arteries are highly prevalent in strokes, and more elaborate calcifications are associated with the male sex and diabetes mellitus. *See* https://www.ahajournals.org/doi/10.1161/STROKEAHA.113.003518#:~:text=Vertebrobasilar%20artery%20(VBA)%20calcifications%20are,frequently%20in%20the%20dominant%20artery.&text=Arteries%20change%20their%20shape%20because,process%20known%20as%20arterial%20remodeling. (visited July 1, 2024).

removed the ingrown toenail, adjusted his diabetes medication due to impaired kidney function, increased his gabapentin dose and noted that Ketron was going to obtain an echocardiogram that week. (R. at 879, 881.) Price instructed Ketron to follow up in one month. (R. at 881.)

On August 21, 2020, Ketron saw Reynolds for continued management of his diabetes. (R. at 939.) Ketron's A1C was 6.2 percent, demonstrating an improvement from his April 2020 measurement of 7.7 percent at his primary care provider's office. (R. at 939.) Ketron indicated that he had recently lost 10 pounds, and he complained of shortness of breath during exertion, dizziness, fainting, sensory abnormality of the feet and that he had fallen in the last three months. (R. at 942.) Physical examination was unremarkable. (R. at 942-43.) Reynolds noted that Ketron's diabetes had improved, and she advised Ketron to drink an adequate amount of water due to diminished kidney function. (R. at 943.)

On August 25, 2020, Ketron was admitted to Norton Community Hospital's emergency department for a blood glucose level of 20. (R. at 970.) Ketron underwent chest imaging that showed no radiographic evidence of acute cardiopulmonary process. (R. at 960.) An EKG performed during this time showed a normal sinus rhythm. (R. at 974.) Ketron was discharged three hours later after his glucose levels stabilized. (R. at 971.)

On September 16, 2020, Ketron followed up with Price, reporting shortness of breath, arthralgias, gait problems and depression. (R. at 870.) On physical examination, Ketron was noted to have a limp and that he was ambulating with a cane, and he also was found to have a slightly elevated respiration rate of 24 breaths per minute. (R. at 870-71.) Ketron told Price that he had only been using insulin if

his blood sugar neared 200. (R. at 868.) Ketron also was tearful in the office over a
recent denial of disability benefits, and he indicated that his legs and feet hurt all of
the time, indicating that previous treatment of his knees with orthopedics brought
minimal relief. (R. at 868.)

On September 3, 2020, Dr. Gene Godwin, M.D., a state agency physician,
completed a physical residual functional capacity assessment, in which he opined
Ketron was limited to sedentary work,[8] except could occasionally lift and carry up
to 20 pounds, and frequently lift and carry up to 10 pounds. (R. at 118.) Dr. Godwin
opined that Ketron could never climb ladders, ropes and scaffolds, but could
occasionally perform all other postural activities, and he could stand and/or walk for
four hours in an eight-hour workday and sit for five hours in an eight-hour workday.
(R. at 118-19.) Dr. Godwin based these findings on Ketron's diabetes, gout and high
blood pressure, as well as the observation that he walked with a cane and his reported
chronic pain. (R. at 118-19.) On March 22, 2021, Dr. David Bristow, M.D., another
state agency physician, completed a physical residual functional capacity
assessment, also opining that Ketron would be limited to sedentary work, but could
occasionally lift and carry up to 20 pounds and frequently lift and carry up to 10
pounds. (R. 172-75.) Dr. Bristow opined that Ketron could stand and/or walk for
four hours in an eight-hour workday and sit for a total of six hours in an eight-hour
workday. (R. at 172.) Dr. Bristow opined that Ketron could occasionally perform
postural activities, except he could never climb ladders, ropes and scaffolds or crawl,
and he should avoid concentrated exposure to extreme heat, cold, vibration and

---

[8] Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting
or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined
as one which involves sitting, a certain amount of walking and standing is often necessary in
carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and
other sedentary criteria are met. See 20 C.F.R. §§ 404.1567(a), 416.967(a) (2023).

hazards, but had no other environmental limitations. (R. at 173-74.) Dr. Bristow based his opinion on Ketron's diabetes, gout, congestive heart failure, coronary artery disease, and high blood pressure, as well as the observation that he walked with a cane and his reported chronic pain. (R. at 173.)

On September 22, 2020, Ketron established care with Amalia Collins, L.C.S.W., a licensed clinical social worker at Wise County Behavioral Health Services, for behavioral health services. (R. at 1184-94.) Ketron complained, "I have been fighting for my disability for the past five years." (R. at 1184.) Ketron said that he felt bad about himself because he had to depend on people financially when he, previously, had always taken care of everyone. (R. at 1184.) Ketron said he felt worthless, and Collins noted that he was tearful at times during his intake interview. (R. at 1184.) Ketron complained of depressed mood, loss of interest in activities, poor attention/concentration, anxious mood, increased need for sleep, avoidance and fatigue. (R. at 1184.) Ketron reported that he had always been the "loner" of the family, the "outcast, black sheep." (R. at 1184.) Ketron said that he had never liked to be in a crowd of people and did not stay long at family gatherings. (R. at 1184.) He complained of high emotional distress due to his medical condition, no income, needing assistance from his son and feeling worthless. (R. at 1184.) He reported that he had suffered from a depressed mood since 2016-17. (R. at 1184.)

Ketron reported that he currently was single, but he had been married three times. (R. at 1184.) Ketron said his first marriage lasted seven years; his second marriage did not last long; and his third marriage lasted about two weeks. (R. at 1184.) He said that he graduated from high school. (R. at 1184.) He said he worked in the mines from 2001 to 2017-18. (R. at 1184.) Ketron reported that he suffered from diabetes, high cholesterol, high blood pressure, neuropathy, shortness of breath,

sleep apnea, glaucoma, hearing problems and chronic pain. (R. at 1184.) He said that grocery shopping would wear him out. (R. at 1884.) Ketron denied homicidal or suicidal thoughts. (R. at 1185, 1194, 1198.)

Collins noted that Ketron's appearance, behavior and speech were appropriate, and his mood/affect was somewhat appropriate. (R. at 1187.) Ketron denied hallucinations and delusions. (R. at 1187.)  Collins noted that Ketron's thought processes were intact, and he was oriented to time, person and place. (R. at 1187.) She noted that his memory and judgment were not impaired, his intelligence was average, and his insight was somewhat impaired. (R. at 1187.) Collins noted that Ketron was dressed and groomed casually and appropriately. (R. at 1201.)

Collins referred Ketron for outpatient mental health individual psychotherapy services to learn about depressive disorders and ways to cope with the illness. (R. at 1184.) Collins recommended individual psychotherapy services twice monthly. (R. at 1185.)

Ketron was diagnosed with persistent depressive disorder on intake and throughout his treatment with Collins. (R. at 1199.) Ketron had therapy sessions with Collins from September 29, 2020 to May 17, 2021. (R. at 46, 1543.)  Ketron participated in an audio telehealth psychotherapy session with Collins on September 29, 2020. (R. at 1202.) Collins noted no overt signs of hallucinations, delusions or other indicators of psychotic processes. Ketron complained that it "aggravates him … that he can't get out and do anything because of breathing difficulty." (R. at 1202.) Collins noted that Ketron was much more motivated, his speech was spontaneous, and he sounded alert and oriented. (R. at 1202.) She noted his thought processes

were logical and more goal-directed, with no indications or verbalizations of suicidal or homicidal ideations. (R. at 1202.)

Ketron participated in an audio telehealth psychotherapy session with Collins again on October 6, 2020. (R. at 1203.) Collins, again, noted no overt signs of hallucinations, delusions or other indicators of psychotic processes. (R. at 1203.) Ketron reported being in the hospital for a week in 2017 after suffering a heart attack. (R. at 1203.) Ketron said that he laid in bed in a dark room for about a month after his discharge from the hospital. (R. at 1203.) Ketron complained that he was very frustrated and felt worthless due to not being able to do the things he used to be able to do. (R. at 1203.) Ketron said that his sleep had improved since using a CPAP machine. (R. at 1203.) Ketron complained that he suffered from pain that made "everything go out of whack, such as blood pressure and eye pressure." (R. at 1203.) Collins noted that Ketron was alert and oriented to time, place, person and situation. (R. at 1203.) Ketron denied suicidal or homicidal ideations. (R. at 1203.) Collins noted that Ketron was much more verbal during this encounter. (R. at 1203.)

Ketron participated in an audio telehealth psychotherapy session with Collins again on October 13, 2020. (R. at 1204.) Collins, again, noted no overt signs of hallucinations, delusions or other indicators of psychotic processes. (R. at 1204.) Ketron reported that he had a female friend who was staying with him a couple of months. (R. at 1204.) He said that he and his friend had cleaned up the house. (R. at 1204.) Ketron reported "good days and bad days." (R. at 1204.) He said his friend had motivated him to get up and be more active. (R. at 1204.) Ketron stated that he was not interested in taking medication for his depression. (R. at 1204.) He said he was not interested in taking more medication "except what he has to take to stay alive." (R. at 1204.) Collins noted that, based on their verbal conversation, Ketron's

mood had improved. (R. at 1204.) She noted that he spoke more spontaneously and shared more information. (R. at 1204.) Ketron agreed that he felt a little better. (R. at 1204.) He and Collins agreed that he was doing well enough to space out his next appointment to two weeks away. (R. at 1204.)

Ketron participated in an audio telehealth psychotherapy session with Collins again on November 4, 2020. (R. at 1302.) Collins noted that Ketron was alert and oriented to time, person, place and situation. (R. at 1302.) There were no overt signs of hallucinations, delusions or other indications of psychotic process. (R. at 1302.) Ketron said that he believed using his C-PAP machine at night had helped him not struggle for breath as badly in the mornings. (R. at 1302.) He said that he starts struggling when he moves around more. (R. at 1302.) Ketron said that he had been trying to get some physical activity by cleaning up a storage building. (R. at 1302.) When asked about his mood, Ketron responded that his biggest downfall had been relationships. (R. at 1302.) He said that he buried himself in work to "deal with stuff." (R. at 1302.) When asked about suicide, Ketron said, "[i]t takes a lot more courage than I have." (R. at 1302.) When asked if he was a pessimist, Ketron said, "I don't know, I am a realist." (R. at 1302.) Collins noted that Ketron was more motivated and was following up on the various areas of his life. (R. at 1302.) She said he was very verbal in session and his ventilated feelings, situations and frustrations. (R. at 1302.)

Ketron participated in an audio telehealth psychotherapy session with Collins again on December 21, 2020. (R. at 1303.) Collins noted that Ketron was alert and oriented to time, person, place and situation. (R. at 1303.) He denied any suicidal or homicidal ideations. (R. at 1303.) His thought processes were logical and coherent. (R. at 1303.) There were no overt signs of hallucinations, delusions or other

indications of psychotic process. (R. at 1303.) Ketron said that he tries to do as much as he can. (R. at 1303.) He said that he did most of the grocery shopping for the household. (R. at 1303.) In response to a depression questionnaire, Ketron endorsed little interest in activities, low energy, some sleep disturbance and some low moods. (R. at 1303.) Ketron admitted that he still had not discussed antidepressant medication with his primary care provider. (R. at 1303.)

Ketron participated in an audio telehealth psychotherapy session with Collins again March 26, 2021. (R. at 1541.) Collins noted that Ketron was alert and oriented to time, person, place and situation. (R. at 1541.) He denied any suicidal or homicidal ideations. (R. at 1541.) His speech was clear and coherent, and his thought processes were logical. (R. at 1541.) There were no overt signs of hallucinations, delusions or other indications of psychotic process. (R. at 1541.) Ketron said the process of waiting and doing all he could for his disability was frustrating. (R. at 1541.) Ketron admitted that he had not discussed the need for antidepressant medication with his primary care provider, Price. (R. at 1541.) Ketron complained of problems sleeping, and he said he felt like he was forgetting stuff more. (R. at 1541.) Ketron said he stayed tired and felt drained all the time. (R. at 1541.) Collins noted that she intended for Ketron to attend one more audio session in April and then discharge him from care if he remained stable. (R. at 1541.)

Ketron participated in an audio telehealth psychotherapy session with Collins again on May 17, 2021. (R. at 1543.) Collins noted that Ketron was alert and oriented to time, person, place and situation. (R. at 1543.) He denied any suicidal or homicidal ideations. (R. at 1543.) His speech was clear and coherent, and his thought processes were logical. (R. at 1543.) There were no overt signs of hallucinations, delusions or other indications of psychotic process. (R. at 1543.) Ketron complained of still

suffering "stress of not having any income and feeling like a burden." (R. at 1543.) Ketron admitted that he still had not spoken to his primary care provider about his depression or his need for antidepressant medication. (R. at 1543.) Ketron stated that he was not sure if continuing mental health services would change much or him at that time, and he and Collins agreed that she would call him the next month to check on his status. (R. at 1543.)

Collins attempted to call Ketron on June 25, 2021, and left a message to call her back. (R. at 1546.) Collins discharged Ketron from care on July 1, 2021. (R. at 1547.)

On October 15, 2020, Ketron saw Price, reporting continued shortness of breath. (R. at 1289.) Ketron indicated that he had not yet been for the pulmonary function test, ("PFT"), that Price had ordered at his last appointment. (R. at 1289.) Ketron endorsed shortness of breath, but denied all other symptoms, and physical examination was unremarkable except for a small scaly nodule on Ketron's abdomen. (R. at 1291.) Price noted that Ketron's recent echocardiogram was normal. (R. at 1289.)

On November 8, 2020, Ketron was hospitalized at Norton Community Hospital for chest pain, and a CT angiogram was performed to assess for a pulmonary embolism due to Ketron's shortness of breath. (R. at 1270, 1278.) The results showed no radiographic evidence for pulmonary artery embolism; moderate to severe multivessel coronary artery disease; and cholelithiasis without evidence of acute cholecystitis, indicating that Ketron had coronary artery disease due to high lipid levels, and an asymptomatic gallstone. (R. at 1270.) That same day, Ketron underwent a stress test for his shortness of breath, and the results were normal. (R.

at 1248-49.) On November 10, Ketron saw Dr. Shipeng Yu, M.D., a cardiologist, to follow up on his chest pain. (R. at 1768.) Ketron endorsed that the pain had began one week previously, was intermittent, happened at rest or on exertion and would last several minutes. (R. at 1768.) Troponin levels and an EKG were normal and did not indicate a cardiac event. (R. at 1768.) Physical examination conducted by Dr. Yu was normal. (R. at 1771.) Dr. Yu prescribed a statin medication, nitroglycerin as needed, advised Ketron to eat a healthy diet and exercise and directed Ketron to follow up with the cardiology clinic. (R. at 1774.)

On November 23, 2020, Ketron saw Price for a follow up on his recent hospitalization. (R. at 1284.) Ketron reported that his chest pain was not associated with exertion and that the hospital had given him oral nitroglycerin to use during episodes of chest pain, which he had used one time since his hospital discharge. (R. at 1284.)

On December 2, 2020, Ketron saw Reynolds for management of his diabetes. (R. at 1335.) Ketron's A1C was 7.6 percent, which was increased from 6.2 percent in August 2020. (R. at 1335.) Ketron complained of shortness of breath with exertion and tingling and pain in his legs and feet, but denied all other symptoms. (R. at 1337.) Physical examination, including a diabetic foot examination, was normal except for diminished feeling and vibratory sense in the feet, but Ketron had intact sensation. (R. at 1338-39.)

On December 16, 2020, Ketron followed up with Dr. Yu, who adjusted Ketron's medications and advised him to follow up in three months. (R. at 1780.) Ketron was diagnosed with coronary artery disease with angina pectoris, mixed hyperlipidemia, right ventricular enlargement and hypertension. (R. at 1780.)

On December 17, 2020, Ketron saw Price for a routine follow up. (R. at 1278.) Ketron complained of shortness of breath, but denied having chest pain and leg swelling in the last several days. (R. at 1280.) Physical examination was unremarkable. (R. at 1281.) Price noted that Ketron was not compliant with a low carbohydrate diet and that his blood sugars remained elevated. (R. at 1278.)

On January 18, 2021, Ketron saw Reynolds for continued management of his diabetes. (R. at 1348.) Ketron's A1C was 8.9 percent. (R. at 1348.) Ketron had no complaints, and physical examination was unremarkable. (R. at 1350-51.) Reynolds changed Ketron to basal/bolus insulin, as she indicated that he was never on an eating or sleeping schedule, and his current premixed insulin was not adequately controlling his levels. (R. at 1352.)

On February 9, 2021, Ketron saw Taylor Repko, O.D., an optometrist, for a diabetic eye examination. (R. at 1422.) Repko noted no signs of diabetic retinopathy, but counseled Ketron on the importance of managing his blood sugar. (R. at 1427.)

On March 2, 2021, Ketron saw Dr. Jeffrey Bunning, M.D., an ophthalmologist, who performed a selective laser trabeculoplasty, ("SLT"),[9] on Ketron. (R. at 1796.) Dr. Bunning noted that the procedure was indicated due to Ketron's noncompliance with using his prescription eyedrops for glaucoma. (R. at 1796.)

---

[9] SLT is a lase treatment that lowers the pressure in the eyes of glaucoma patients by creating a chemical and biological change in the drainage tissue, leading to better fluid drainage out of the eye. *See* glaucoma.org/treatment/laser/slt (last visited July 2, 2024.)

On March 16, 2021, Ketron followed up with Dr. Yu. (R. at 1781.) Dr. Yu noted that Ketron's recent echocardiogram was normal, that his chest pain was improved, his hypertension was stable, his current medication regime was effective and he was to follow up in one year. (R. at 1788.)

On March 17, 2021, Ketron underwent a pulmonary function test at the request of Disability Determination Services. (R. at 1449-64.) While there is no detailed interpretation of the results in the record, Dr. Bristow opined that the pulmonary function test was "acceptable." (R. at 168.)

On March 18, 2021, Ketron saw Price for a follow up. (R. at 1471.) Ketron indicated that he had been to his cardiologist that week and was told he was stable and to return in one year. (R. at 1471.) Ketron reported still having shortness of breath if he walked about 200 yards[10] and endorsed arthralgias, back pain and burning in his feet at night but denied all other symptoms. (R. at 1471, 1473.) Physical examination was unremarkable. (R. at 1474.) Price noted that Ketron remained noncompliant with his diet and that his blood sugar was elevated. (R. at 1471.) She recommended that Ketron consider physical therapy for strengthening and endurance, but he declined, citing transportation issues and concerns about Covid-19. (R. at 1476.)

On April 9, 2021, Ketron saw Reynolds for continued management of his diabetes. (R. at 1554.) Ketron presented to the office using a cane, and he complained of pain and tingling in his feet and shortness of breath with exertion. (R. at 1556-57.) Physical examination was unremarkable. (R. at 1557.) Ketron's A1C was 12.2

---

[10] One place in the treatment note states 200 yards, while another states 200 feet. (R. at 1471, 1473.)

percent, up from 8.9 percent at his last appointment, and Reynolds adjusted his insulin dose. (R. at 1554, 1558.)

On May 4, 2021, Ketron saw Repko to follow up after the recent SLT for his glaucoma. (R. at 1670.) Repko noted that Ketron's intraocular pressure was still higher than it should be, and she told Ketron if his pressures had not dropped by the next visit, he would need to restart medications. (R. at 1676.) At his follow-up appointment on June 17, Repko found minimal improvement in Ketron's eye pressures and prescribed him an eye drop for management. (R. at 1683.) On August 10, 2021, Repko noted that Ketron had a history of poor compliance for taking his medications as prescribed. (R. at 1684.) Ketron's eye pressures remained elevated and he was initiated on a prescription medication to use along with the previously prescribed eye drops. (R. at 1690.) On September 21, because Ketron's eye pressures still were elevated, Repko told him to use the eye drops more frequently and initiated him on a third medication. (R. at 1697.)

On June 17, 2021, Ketron saw Price for a follow up. (R. at 1634.) Ketron reported having some muscle aches and joint pain, but indicated that they had lessened. (R. at 1634.) Ketron's sugars were in the upper 200 to 500 range, and Price noted that Ketron's diabetes had been poorly treated for several years due to his inability to pay for insulin and noncompliance with his diet. (R. at 1634.) Price noted that Ketron walked with a cane, but the remainder of physical examination was unremarkable. (R. at 1637-38.) Price also conducted a diabetic foot examination, and Ketron's left foot had diminished vibratory sensation and sharp/dull discrimination, but intact filament testing, while his right foot had normal vibratory sensation and sharp/dull discrimination, but diminished filament test. (R. at 1638.)

On July 16, 2021, Ketron saw Reynolds for continued management of his diabetes. (R. at 1560.) His A1C was 11.5 percent, and his blood sugar was 305 in the office. (R. at 1560.) Ketron's continuous glucose monitor revealed that he was only in his target blood sugar range around one percent of the time. (R. at 1560.) Ketron presented to the office with a cane and complained of shortness of breath, ankle swelling and pain and tingling in his feet. (R. at 1562-63.) Reynolds noted that Ketron ambulated with a cane and had an abnormal gait, but the remainder of the physical examination was unremarkable. (R. at 1563-64.) Reynolds adjusted Ketron's medications. (R. at 1564.)

On August 26, 2021, Ketron was admitted to Norton Community Hospital for pancreatitis. (R. at 1570.) Ketron complained of nausea, abdominal pain and generalized malaise. (R. at 1571.) Ketron was in the hospital for five days and underwent surgery to remove his gallbladder while he was there. (R. at 1588-89.) Ketron was discharged from the hospital the day after his gallbladder removal. (R. at 1620.)

On September 14, 2021, Ketron followed up with Price after his hospitalization. (R. at 1643.) Ketron reported having shortness of breath, arthralgias, back pain and gait problems, but denied all other symptoms. (R. at 1645.) Physical examination was unremarkable. (R. at 1645.)

Ketron submitted a Medical Assessment Of Ability To Do Work-Related Activities (Mental) form, completed by Collins on March 1, 2022, to the Appeals Council. (R. at 45-47.) On this assessment form, Collins stated that Ketron's ability to deal with the public, to interact with supervisors, to function independently, to understand, remember and carry out detailed, but not complex, and simple job

instructions and to maintain personal appearance was slightly limited, but still satisfactory. (R. at 45-47.) Collins also stated that there were serious limitations, resulting in unsatisfactory work performance, in Ketron's ability to follow work rules, to relate to co-workers, to use judgment in public, to understand, remember and carry out complex job instructions, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. (R. at 45-46.) She stated that Ketron had no useful ability to deal with work stresses and to maintain attention/concentration. (R. at 45.) When asked to list the medical/clinical findings that supported her assessment, Collins stated that Ketron suffered from severe medical illnesses of diabetes, glaucoma, history of heart attack, chronic pain and fatigue. (R. at 46.) She also listed Ketron's depressed mood, loss of interest in activities, poor concentration, fatigue, anxious mood, low energy, criticism of self and pessimism about his future. (R. at 46.) Collins said that Ketron's difficulty breathing and chronic pain made activities of daily living, such as dressing, shopping for groceries and preparing simple meals difficult. (R. at 47.) She said that Ketron suffered from excessive and inappropriate grief due to not being able to work as a coal miner. (R. at 47.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2023). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If

the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2023).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 423(d)(2)(A) and § 1382c(a)(3)(A)-(B); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Ketron argues that the ALJ's decision is not based on substantial evidence. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment ("Plaintiff's Brief" at 4-5.))  Specifically, he argues the ALJ erred by improperly

determining his residual functional capacity, as the medical opinions of Amalia C. Collins, L.C.S.W./L.P.C., and Kathi Price, F.N.P., support a finding that the "ALJ's determination of Ketron's [residual functional capacity] is unsupported by the substantial evidence of record." (Plaintiff's Brief at 5.) This is the entirety of counsel's argument.

When making a residual functional capacity assessment, the ALJ must assess every medical opinion received in evidence. The regulations provide that the ALJ "will not defer or give any specific evidentiary weight, including controlling weight" to any medical opinions or prior administrative medical findings, including those from the claimant's medical sources. 20 C.F.R. §§ 404.1520c(a), 416.920c(a) (2023). Instead, an ALJ must consider and articulate how *persuasive* she finds all the medical opinions and all prior administrative medical findings in a claimant's case. *See* 20 C.F.R. §§ 404.1520c(b), (c)(1)-(5), 416.920c(b), (c)(1)-(5) (2023) (emphasis added). Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together in a single analysis" and need not articulate how she considered those opinions or findings "individually." 20 C.F.R. §§ 404.1520c(b)(1), 416.920c(b)(1) (2023).

The most important factors in evaluating the persuasiveness of these medical opinions and prior administrative medical findings are supportability and consistency, and the ALJ will explain how she considered these two factors in her decision. *See* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2) (2023). "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. §§

404.1520c(c)(1), 416.920c(c)(1). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2). The ALJ is not required to explain the consideration of the other three factors, including relationship with the claimant, specialization and other factors such as an understanding of the disability program's policies and evidentiary requirements.[11] *See* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).

First, Ketron argues that Collins's medical opinion does not support the ALJ's determination of Ketron's residual functional capacity. Collins is a licensed clinical social worker and licensed professional counselor who conducted six behavioral health therapy sessions with Ketron from September 29, 2020, to March 26, 2021. (R. at 46.) While these therapy records were present in the administrative record at the time of the ALJ's decision, Collins's assessment is dated March 1, 2022, which was after the ALJ rendered her decision. (R. at 47.) In rendering her decision, the ALJ considered all of Ketron's therapy appointments. (R. at 54-55.) The ALJ found that Ketron had a medically determinable impairment of depression, but that it did not cause more than minimal limitation in his ability to perform basic mental work activities and was, therefore, nonsevere. (R. at 54.) In making that finding, the ALJ considered the four broad functional areas of mental functioning, set out in 20 C.F.R. Part 404, Subpart P, Appendix 1, known as the "paragraph B" criteria. *See* 20 C.F.R.

---

[11] An exception to this is that when the ALJ finds that two or more "medical opinions or prior administrative medical findings about the same issue are both equally well-supported [] and consistent with the record [] but are not exactly the same," the ALJ will explain how she considered the other most persuasive factors including: the medical source's relationship with the claimant, specialization and other factors that tend to support or contradict a medical opinion. 20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3) (2023).

Pt. 404, Subpt. P, App. 1, § 12.00(A)(2)(b) (2023). With respect to the first area of functioning, the ability to understand, remember or apply information, the ALJ found that Ketron had no limitation. (R. at 54.) In support of this, the ALJ pointed to Ketron's intact memory and full orientation at all mental status examinations, as well as his ability to answer questions from doctors, the ALJ and his attorney. (R. at 54.) Regarding the next area, the ability to interact with others, the ALJ found that Ketron had no limitation. (R. at 54.) The ALJ supported this finding by pointing to the absence of any discussion of Ketron's limitation in this area in the record. (R. at 54.) Next, the ALJ found that Ketron was mildly limited in the third area, his ability to concentrate, persist and maintain pace. (R. at 54.) The ALJ found support for this by Ketron's report in therapy that he had trouble concentrating, but noticed that this symptom was no longer reported in subsequent visits. (R. at 54.) Lastly, the ALJ found that Ketron was mildly limited in his ability to adapt or manage himself. (R. at 54.) The ALJ noted that Ketron initially reported mild, passive suicidal ideation at his first therapy sessions, but indicated that he was feeling better about himself and did not report persistent suicidal ideations at subsequent appointments. (R. at 54, 1194, 1198, 1201, 1302, 1541.)  Additionally, Ketron and Collins mutually agreed that Ketron would be discharged from behavioral health services after only five sessions, and he told his therapist that he was not interested in taking mental health medications. (R. at 1542-43.)

The medical opinion by Collins, dated March 1, 2022, was evidence submitted to the Commissioner at the Appeals Council level. (R. at 2.) In rendering its decision, however, the Appeals Council indicated that it had received the evidence, but that the "evidence does not show a reasonable probability that it would change the outcome of the decision" and, therefore, the Appeals Council "did not exhibit this evidence." (R. at 2.) The regulations direct that the Appeals Council is to consider

whether the additional evidence is "new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision" when deciding whether to grant review. 20 C.F.R. §§ 404.970(a)(5), 416.1470(a)(5) (2023). The regulations also direct that the Appeals Council will evaluate all additional evidence it receives, but it will only mark as an exhibit and make part of the official record additional evidence it determines meets the requirements of 20 C.F.R. § 404.970(a)(5) and (b) and 20 C.F.R. § 416.1470(a)(5) and (b). *See* 20 C.F.R. §§ 404.976(b), 416.1476(b) (2023). If the Appeals Council needs to file a certified administrative record in federal court, the regulations provide that all additional evidence the Appeals Council received during the administrative review process, including additional evidence received but not exhibited or made part of the official record by the Appeals Council, will be included in that certified administrative record. *See* 20 C.F.R. §§ 404.976(b), 416.1476(b). Additionally, 42 U.S.C. § 405(g) states:

> As part of the Commissioner's answer the Commissioner of Social Security shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based. The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner. . . . The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . .

42 U.S.C. 405(g). It is well-settled that the "Appeals Council must consider new and material evidence relating to the period prior to the ALJ decision in determining whether to grant review, even though it may ultimately decline review." *Wilkins*,

953 F.2d at 95. In *Wilkins*, the court was faced with a substantially similar issue to this case, wherein a healthcare provider whose treatment records already were contained in the record, then went on to submit a medical opinion at the Appeals Council level. *See Wilkins*, 953 F.2d at 94-95. The court in *Wilkins* stated that because "[t]he Appeals Council specifically incorporated [the] letter . . . into the administrative record . . . we must review the record as a whole, including the new evidence, in order to determine whether substantial evidence supports the Secretary's findings." 953 F.2d at 96.

As stated above, the Appeals Council, in this case, did not consider Collins's March 1, 2022, assessment other than to find that this "evidence [did] not show a reasonable probability that it would change the outcome of the decision." Plaintiff's brief does not challenge this finding by the Appeals Council. I find no error in that decision.

Collins's form-based medical opinion consists of three pages. (R. at 45-47.) On the first page, there is a grid where the healthcare provider is to indicate the level of impairment that a claimant has, in their opinion, in each of the areas assessed. (R. at 45.) Collins indicated that Ketron would have a "marked" impairment in his ability to follow work rules, to relate to co-workers and to use judgment in public. (R. at 45.) She opined that Ketron would have an "extreme" limitation in his ability to deal with work stresses and to maintain attention and concentration. (R. at 45.) Lastly, Collins opined that Ketron had a "moderate" limitation in his ability to interact with supervisors, deal with the public and to function independently. (R. at 45.) The form then goes on to direct the healthcare provider to "[d]escribe any limitations and include the medical/clinical findings that support this assessment." (R. at 46.) To this prompt, Collins opined that Ketron "[w]as referred by his medical provider . . . for

outpatient behavioral health services, due to increase in depressive symptoms – anhedonia, feelings of worthlessness, helplessness, hopelessness, suffers severe medical illnesses, diabetes, glaucoma, [history] of heart attack, chronic pain . . . and fatigue." (R. at 46.) Collins then opined that Ketron had a "marked" limitation in his ability to understand, remember and carry out complex job instructions, and a "moderate" limitation in his ability to understand, remember and carry out both simple and detailed, but not complex, job instructions. (R. at 46.) Collins opined that Ketron was unable to do these tasks because he had a "[d]epressed mood, loss of interest in activities, poor concentration, fatigue, anxious mood, low energy, critical of self" and was "pessimistic about his future." (R. at 46.) In response to a directive invoking Collins to explain these limitations, she opined that they were due to "[f]rustration due to dealing with medical illnesses, difficulty breathing and chronic pain make activities of daily living difficult – dressing, shopping for groceries, preparing simple meals, keeping medical appointments" and "[d]ecreased feelings of self worth and feels like a burden to only son, excessive and inappropriate guilt due to not being able to work as a coal miner." (R. at 47.) Lastly, Collins opined that Ketron was limited in his ability to work due to "[n]o energy, difficulty moving at adequate pace – walking, shopping, dressing . . [a]ctivities of daily living becoming increasingly harder" and "[l]ow self-esteem." (R. at 47.) Collins further opined that Ketron was able to manage benefits in his own best interest, and she indicated that the questions inquiring about Ketron's potential absences from work were not applicable. (R. at 47.)

Although these limitations conflict with the ALJ's residual functional capacity finding, that alone does not compel the conclusion that the assessment raises a reasonable probability of a different outcome. *See Emerson v. Kijakazi*, 2022 WL 1004584, at *9 (M.D.N.C. Apr. 4, 2022). The applicable regulation explains under

the "supportability" factor that, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support . . . her medical opinion(s) . . . , the more persuasive the medical opinions . . . will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). Here, Collins's assessment is not supported by her own treatment records, in particular, the fact that she discharged Ketron from services after only seven behavioral health sessions. Additionally, Collins's opinion is inconsistent with her own therapy notes, wherein she references Ketron driving his daughter-in-law places, working with his grandson's chickens, cleaning out a storage building and doing grocery shopping for most of the household. (R. at 1302, 1303, 1543.) Additionally, there is substantial evidence in the record to support that Ketron does not have a pulmonary impairment other than sleep apnea. Lastly, as the ALJ noted, there is no evidence in the record of Ketron having a heart attack. (R. at 61.) Therefore, I find that Collins's medical opinion, viewed with the record as a whole, does not contravene the substantial evidence of record supporting the ALJ's denial of Ketron's claims.

Ketron next argues that the ALJ improperly considered the medical opinion of Price, Ketron's primary care provider. (Plaintiff's Brief at 4-5.) Unlike Collins's opinion, Price's medical opinion, dated September 16, 2020, was available for the ALJ at the time the ALJ rendered her opinion. (R. at 1536-37.) Price opined that Ketron was "unable to maintain any gainful employment at present." (R. at 1537.) In a March 18, 2021, treatment record, appointment, Price stated that she was "doubtful that [Ketron would] ever be able to sustain gainful employment again." (R. at 1476.) Under the regulations, a "medical opinion" is a statement from a medical source about what a claimant can still do despite his impairments and whether the claimant has one or more impairment-related limitations or restrictions affecting his ability to perform basic work activities. *See* 20 C.F.R. §§

404.1513(a)(2), 416.913(a)(2) (2023). Statements on issues reserved to the Commissioner are considered inherently neither valuable nor persuasive under the regulations, and, therefore, the ALJ is not required to evaluate the persuasiveness of the statements regarding these issues. *See* 20 C.F.R. §§ 404.1520b(c), 416.920b(c) (2023). Accordingly, the regulations direct that the ALJ "not provide any analysis about how [they] considered such evidence in [their] determination or decision." *See* 20 C.F.R. §§ 404.1520b(c), 416.920b(c). Because Price's opinion on this issue has no evidentiary weight, substantial evidence review does not apply.

Price also opined that Ketron had been disabled since May 2017 due to shortness of breath and uncontrolled diabetes with associated neuropathy. (R. at 61, 1537.) The date a disability began is not an issue reserved for the Commissioner; therefore, the ALJ analyzed this opinion. *See* 20 C.F.R. §§ 404.520b, 416.920b. The ALJ found this opinion to unpersuasive, as it was both unsupported by and inconsistent with the record. (R. at 61.) Specifically, the ALJ noted that Price offered no functional limitations to support this opinion. (R. at 61.) The ALJ noted that while Ketron does have neuropathy, it is worse at night and he can walk 200 feet before experiencing shortness of breath. (R. at 61.) The ALJ also noted that there is no evidence in the record that Ketron has a pulmonary impairment other than sleep apnea. (R. at 61.) In fact, pulmonary function testing showed that Ketron had normal pulmonary function. (R. at 168, 1450-64.) Additionally, Ketron's providers, including his cardiologist and endocrinologist, encouraged him to engage in physical activity, and he was never told to limit activity, including walking, due to his neuropathy or shortness or breath. (R. at 1311, 1318, 1375, 1774, 1788.)

Based on the foregoing, I find substantial evidence exists in the record to support the ALJ's consideration of Price's medical opinion, as well as her ultimate conclusion that Ketron was not entitled to DIB and SSI benefits.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.   Substantial evidence exists in the record to support the Appeals Council's finding that Collins's March 1, 2022, assessment did not show a reasonable probability that it would change the outcome of the ALJ's decision;

2.   Substantial evidence also exists in the record to support the ALJ's consideration of Price's medical opinion; and

3.   Substantial evidence exists in the record to support the Commissioner's finding that Ketron was not disabled under the Act and was not entitled to DIB and SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Ketron's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:    July 10, 2024.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE